# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| WARD-KRAFT, INC., ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| vs. ) | Case No.: 4:18CV1725 HEA |
| ) | |
| ZEBRA TECHNOLOGIES ) | |
| CORPORATION, et al., ) | |
| ) | |
|     Defendants. ) | |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment, [Doc. No. 61]. Defendants have filed an opposition to the Motion, to which Plaintiff has replied. For the reasons set forth below, the Motion is denied.

### Facts and Background[1]

Plaintiff's First Amended Complaint alleges the following:

Since 1972, Ward Kraft has been a nationally known leader in the printing industry, specializing in the design and production of labels, commercial printing, mailers, and business forms. Ward Kraft's expertise includes creating continuous,

---

[1] The recitation of facts is taken from Plaintiff's First Amended Complaint and is set forth for the purposes of this motion only. It in no way relieves the parties of the necessary proof of any stated fact in later proceedings.

unit set, cut sheet labels and form/label combinations for use in a variety of different industries.

In the late 1990's, Jim Riley approached Ward Kraft about assisting with the design and development of self-laminating patient identification wristband forms for use in hospitals and throughout the medical industry. Jim Riley was then an officer of Riley, Barnard & O'Connell Business Products Inc. ("RBO"), and the owner of Laser Band, LLC. Ward Kraft agreed and expended substantial time and resources, and provided valuable expertise, in order to develop these wristband forms, which the parties referred to as the "LB1" products. RBO agreed that, in return for Ward Kraft's significant contributions, Ward Kraft would have the exclusive right to manufacture the LB1 products. Ward Kraft ultimately did, in fact, design and manufacture these products for RBO.

In March 1999, The Standard Register Company, another market participant, threatened RBO with litigation in relation to the LB1 products. RBO then brought suit against Standard Register, seeking a declaration of non-infringement, invalidity, and unenforceability of a patent owned by Standard Register relating to certain wristband forms and labels. Standard Register then filed counterclaims against RBO and Ward Kraft alleging patent infringement, which RBO and Ward Kraft denied.

[2]

In August 2000, RBO, Standard Register, and Ward Kraft came to an agreement to end all litigation and, in conjunction with additional interested non-parties Jim Riley, Laser Band, and the Avery Dennison Corporation, entered into certain other agreements to govern the rights of the various entities moving forward.

As a result, in addition to a Settlement Agreement between RBO, Standard Register, and Ward Kraft, Laser Band and Ward Kraft entered into a separate License Agreement signed May 16, 2003 and made effective August 11, 2000, whereby Ward Kraft agreed to make and sell certain licensed wristband forms in exchange for the payment of royalties to Laser Band.

Under ¶ 1 of the License Agreement, and as reflected in various other portions of the License Agreement, Laser Band granted to Ward Kraft a royalty-bearing, non-exclusive license/sub-license under four patents owned by Laser Band (referred to as the "Riley Patents" in the License Agreement) and one patent owned by Standard Register and licensed to Laser Band (referred to as the "Standard Patent" in the License Agreement). The license granted Ward Kraft the right, under the aforementioned patents, to make, use, offer to sell, sell, and import certain types of forms identified by Laser Band as PLS-102 and PLS-102W, as well as "other forms having both labels and a Wristband, the wristband being formed from a portion of the face ply and a portion of the liner ply, with the liner

[3]

ply having a pair of integrally formed tabs for fastening the wristband and with a substantial portion of the face ply in the completed wristband being laminated on both sides by the portion of the liner ply." These forms are defined and referred to throughout the License Agreement as "Combo Forms."

Paragraph 1 of the License Agreement further states that "Combo Forms covered by any of the Riley Patents or the Standard Patent shall be considered as 'Licensed Products'."

In addition to the royalty-bearing patent license granted by Laser Band to Ward Kraft, the License Agreement includes a mutual covenant by the parties not to sue each other in connection with Combo Forms. Specifically, in ¶ 12(h) of the License Agreement, Laser Band granted to Ward Kraft and Ward Kraft granted to Laser Band "a covenant not to sue under any intellectual property or other right in connection with the making, using, offering for sale, sale and importing of the Combo form."

On March 20, 2014, Laser Band assigned its "rights, title, and interest" in sixteen different trademarks to ZIH Corp., including trademarks used on or in connection with Combo Forms.

On July 9, 2018, Defendant Laser Band along with its corporate successors Defendants Zebra Technologies Corporation, Zebra Technologies International, LLC, and/or ZIH Corp (collectively, "Zebra") filed a lawsuit in the District Court

for the Northern District of Illinois (Case No. 1:18-cv-04711-SLE) (the "NDIL Lawsuit") against Ward Kraft and one of its primary distributors, Typenex Medical, LLC ("Typenex").

According to the Complaint in the NDIL Lawsuit, which was filed in 2018, "Zebra" has "continuous use" of various Laser Band trademarks "over the last [12 or 16] years." The NDIL Complaint further states that "Zebra acquired Laser Band in 2012, including Laser Band's trademarks and trade dress rights, and the goodwill associated with such marks and trade dress."

The NDIL Lawsuit alleges that Ward Kraft is manufacturing, using, and/or selling a number of various forms that infringe Laser Band's and/or Zebra's intellectual property rights. Specifically, Laser Band and Zebra allege that "Ward Kraft manufactures and sells business forms that incorporate self-laminating, laser-printable patient identification wristbands, which Typenex markets and sells under the following marks: Helix AC Laser (Adult), Helix AC Laser L2 (Adult), Helix AC Laser L2 (Pediatric/Infant), Helix AC Laser L3 (Adult), FamBand Helix Laser AC, and FamBand Laser," which the Complaint in the NDIL Lawsuit refers to as "Typenex Products."

Laser Band and Zebra also allege that "Ward Kraft markets and sells business forms that incorporate self-laminating, laser-printable patient

[5]

identification wristbands under the PolyBand mark." All of these accused products are the successor wristband forms to the original LB1 products mentioned above.

More specifically, the NDIL Lawsuit alleges that the Helix AC Laser L2 and/or Helix AC Laser L3 products infringe one or more of Laser Band's U.S. Patent No. 7,779,569, U.S. Patent No.8,011,125, U.S. Patent No. 7,017,293, U.S. Patent No. 7,017,294, U.S. Patent No. 7,222,448, U.S. Patent No. 7,325,347, U.S. Patent No. 7,461,473, and U.S. Patent No. 7,779,570.

The NDIL Lawsuit alleges that the Helix AC Laser (Adult), Helix AC Laser L2 (Adult), Helix AC Laser L2 (Pediatric/Infant), Helix AC Laser L3 (Adult), FamBand Helix Laser AC, FamBand Laser, and PolyBand 3 products infringe one or more of Laser Band's and/or Zebra's trademark or trade dress rights under 15 U.S.C. § 1125(a).

The NDIL Lawsuit also alleges that Ward Kraft uses Laser Band's and/or Zebra's LASER BAND trademark in a misleading fashion such that Ward Kraft violates 15 U.S.C. § 1125(a).

In the NDIL Lawsuit, Ward Kraft has pleaded the covenant not to sue as an affirmative defense to Laser Band's and Zebra's claims but has not asserted any affirmative cause of action for breach or to enforce the License Agreement.

Roughly one week before the License Agreement was signed, Ward Kraft and Laser Band entered into a Laser Band Authorized Master Distributor

[6]

Agreement ("Master Distributor Agreement"). According to the Master Distributor Agreement, "[Ward Kraft] is hereby granted a limited license to use [Laser Band's] trademarks including its registered trademark "LASERBAND" and any other trademarks or service marks (each, a "Licensed Trademark")…" According to the Master Distributor Agreement, Laser Band and Ward Kraft "agree to indemnify and hold each other harmless from and against all claims, liabilities, losses, damages or expenses, including reasonable attorney fees, by reason of any claim arising out of the other's actions or omissions…"  "The scope of this includes and is not limited to misrepresentations…, actions or promises made by [Laser Band] or [Ward Kraft], its employees and/or agents to the other or customers, end-user prospects."

On March 18, 2019, Ward Kraft received a letter dated March 14, 2019 from Mike Thieme on letterhead for "Laser Band, LLC[,] A Zebra Technologies Company" (the "Termination Letter").  In the Termination Letter, Defendants state that "Ward Kraft's appointment as an Authorized LaserBand Master Distributor [under the LaserBand Authorized Master Distributor Agreement, dated May 8, 2003] is hereby terminated, effective sixty (60) days from the date of your receipt of this notice," effectively acknowledging that the Master Distributor Agreement was in force as of the date of the Termination Letter.

Plaintiff has brought the following claims:  Breach of the License Agreement (Count I); Declaratory Judgment as to the Covenant Not to Sue (Count II); Breach of the Master Distributor Agreement (Count III); and Specific Performance of Indemnity and Recovery Under the Master Distributor Agreement (Count IV).

Plaintiff seeks summary judgment on Count I, that Defendants breached the Covenant Not to Sue found in the License Agreement when Laser Band filed suit against Plaintiff in the Northern District of Illinois.  It also seeks summary judgement on Count II, which seeks a declaratory judgment that Plaintiff's Helix AC Laser L3 product falls within the scope of the Covenant Not to Sue in the License Agreement and that the Covenant Not to Sue bars any claims by Laser Band over this product.

## Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden is on the moving party. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op. Inc.,* 838 F.2d 268, 273 (8th Cir. 1988). After the moving party discharges this burden, the nonmoving

party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth affirmative evidence and specific facts by affidavit and other evidence showing that there is a genuine dispute of a material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. "A dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Herring v. Canada Life Assur. Co.,* 207 F.3d 1026, 1030 (8th Cir. 2000) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). A party resisting summary judgment has the burden to designate the specific facts that create a triable controversy. *See Crossley v. Georgia–Pacific Corp.,* 355 F.3d 1112, 1114 (8th Cir. 2004).

  In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Matsushita,* 475 U.S. at 587; *Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005). The Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.,* 210 F.3d 845, 847 (8th Cir. 2000).

## Discussion

Plaintiff argues the License Agreement is unambiguous. The covenant not to sue is not limited to "Licensed Products" which is defined as "Combo forms covered by any of the Patents listed in the Agreement," rather, the covenant extends to all "combo forms." Ergo, since the Helix AC Laser L3[2] meets the definition of a "combo form" in the License Agreement, it is covered under the covenant and therefore Defendants are precluded from filing suit with respect to whether its production and distribution violates any patent, trademark, trade dress and goodwill rights Defendants have in any products.

Conversely, Defendants argue that the term "combo form" refers solely to the licensed products based on the use of the term throughout the License Agreement and the context within which it is used.

> The cardinal rule of contract interpretation is to ascertain the parties' intention and to give effect to that intention.
>
> The intent of the parties is to be based upon the terms of the contract alone and not on extrinsic evidence unless the contract language is ambiguous. An ambiguity arises only if the terms are reasonably open to more than one meaning, or the meaning of the language is uncertain. Mere disagreement between the parties does not render contractual terms ambiguous. Rather, the test is whether the disputed language, in the context of the entire agreement, is reasonably susceptible to more than one construction when the words are given their plain and ordinary meaning.
> *Langdon v. United Restaurants, Inc.*, 105 S.W.3d 882, 887 (Mo. App. W.D. 2003) (internal citations omitted).

---

[2] Laser Band has filed suit with respect to several products.  Plaintiff has selected one representative product, the Helix AC Laser L3 in this motion.

*Cox v. Grady Hotel Investments, LLC,* No. WD83097, 2020 WL 4290049, at *4 (Mo. Ct. App. July 28, 2020).

In determining the intent of the parties to a contract, the court reviews the terms of a contract as a whole, not in isolation. *Tuttle v. Muenks,* 21 S.W.3d 6, 11 (Mo.App. W.D.2000). The intent of the parties is ascertained, not by a process of dissection in which words or phrases are isolated from their context, but rather from a process of synthesis in which the words and phrases are given a meaning in accordance with the obvious purpose of the contract as a whole. *Lamoureux v. MPSC, Inc.*, 849 F.3d 737, 740 (8th Cir. 2017).

> The License Agreement provides, in pertinent part:
>
> THIS AGREEMENT, effective as of the 11 th day of August, 2000, by and between Laser Band, LLC, a Missouri limited liability company having its principal place of business at 2 I 2 South Bemiston Ave., Suite 300, St. Louis, Missouri 63105 ("Licensor"), and Ward/Kraft, Inc., a Kansas corporation having its principal place of business at 240 I Cooper Street, Fort Scott, Kansas 6670 I ("Licensee").
>
> WHEREAS, Licensor is the owner by assignment of U.S. Patent Nos. 5,933,993, 6,000,160, 6,067,739 and 6,438,881 and patents which may issue from any applications claiming priority from the applications for those patents, including all continuations, continuations in part and divisionals thereof, and any re-issues, re-examinations and any extensions thereof (hereinafter the "Riley Patents"); and
>
> WHEREAS, Licensor is the holder of an exclusive license with the right to sublicense others under U.S. Patent No. 5,653,472 from The Standard Register Co. (hereinafter the "Standard Patent"); and
> WHEREAS, Licensor and Licensee have entered into a Settlement Agreement with The Standard Register Company ("Standard") dated August

11, 2000 and a Term Sheet Agreement with Avery Dennison Corporation ("Avery"), James Riley ("Riley") and Riley Barnard & O'Connell ("RBO") dated August 10, 2000 setting forth the terms for licensing the aforementioned Riley Patents and Standard Register Patent to Licensee in connection with the resolution of litigation between Standard, RBO and Ward/Kraft; and

WHEREAS, Licensor and Licensee have agreed to modify the provisions of the Term Sheet as set forth herein.

NOW, THEREFORE, in consideration of the representations and promises set forth herein, Licensor and Licensee agree as follows:

1. License Grant. Laser Band hereby grants to Ward Kraft, and Ward Kraft hereby accepts, a nonexclusive license, without the right to grant sublicenses, under the Riley Patents, to make, have made for it, use, offer to sell, sell and import forms of the type previously identified by Laser Band as PLS- I 02 and PLS-102W and
other forms having both labels and a Wristband, the wristband being formed from a portion of the face ply and a portion of the liner ply, with the liner ply having a pair of integrally formed tabs for fastening the wristband and with a substantial portion of the face ply in the completed wristband being lan1inated on both sides by the portion of the liner ply (Combo Form(s)).

Laser Band hereby grants to Ward Kraft and Ward Kraft hereby accepts, a non-exclusive subIicense, without the right to further sub-license, under the Standard Patent, to make, have made for it, use, offer to sell, sell and import Combo Forms. Combo Forms covered by any of the Riley Patents or the Standard Patent shall be considered as "Licensed Products."

           \*    \*    \*    \*

3. Royalty.

A. Royalty Amount. In consideration for the license and sublicense granted herein, Licensee shall pay to Licensor a royalty for Licensed Products it makes, sells or imports in the Territory of two and one-half cents per sheet ($0.025) for the period from and after August 11 , 2000 and prior through June 30, 2002, for each Licensed Product, or three cents per sheet ($0.03) for the period from and after July l, 2002 and throughout the remaining term of

this Agreement. Licensor represents and warrants that the royalty rates set forth above to Licensee are at least as favorable as any other license granted by Licensor under the Riley Patents and the Standard Register Patent and Licensor shall both immediately inform Licensee and adjust the royalty rates set forth herein in the event that Licensor shall grant any license having a more favorable royalty rate than that set forth herein.

B. Royalty Obligation. Licensee shall be obligated to pay Licensor a royalty as set forth above upon the sale of any product which would, but for the grant of the license herein, infringe one or more claims of an issued one of the Standard Patent and/or Riley Patents which are valid, subsisting and enforceable. A claim shall be considered valid, subsisting and enforceable if it is set forth in an unexpired one of the Standard Patent and/or the Riley Patents for which all maintenance fees have been paid and are current and has not been found to be invalid or unenforceable by a judgment of a com1 which is final and not appealed or is not appealable, or has been cancelled or dedicated to the public. Royalties shall be due on all sales of Licensed Products by Licensee, including sales to Licensor. A "sale" shall be deemed to have been made hereunder as of the date of first invoicing for a Licensed Product and Licensee shall issue invoices on or about the time it ships Licensed Products and in accordance with its normal business practices. A credit against royalties shall be allowed for any royalty previously paid for Licensed Products which are returned to Licensee for any reason.

C. Royalty Reporting. Except for the first report and payment, on or before April 30, July 31, October 30 and January 31 of each year, Licensee shall provide Licensor with a written report setting forth in reasonable detail the Licensed Products sold by Licensee during the preceding calendar quarter and shall pay to Licensor all royalties due during the preceding calendar quarter as provided herein. The first report and payment shall be due on or before the first date set forth above following the calendar quarter in which this agreement is executed and shall cover the period between August 10, 2000 and the end of the calendar quarter in which this agreement is executed. Licensee shall show and be credited with any royalty payments already made to Licensor for sales during that period. Licensee shall keep suitable records of sales of the Licensed Products for a period of three (3) years following such report sufficient to enable Licensor or Standard to examine such records to determine the accuracy of royalties paid by Licensee. Licensor or Standard may examine such records by a certified public accountant during normal business hours and on reasonable notice

[13]

and shall not disrupt Licensees normal business activities, but not more frequently than twice during any twelve (12) month period. In the course of such examination, the certified public accountant shall report to Licensor or Standard only the number of sheets of Licensed Products sold, and the royalties due and owing by Ward Kraft. Should such examination detem1ine that royalties have been underpaid by more than five percent (5%) of the royalties actually due and owing for any calendar quarter, then Licensee shall pay to Licensor or Standard, as appropriate, the full costs of such examination within 10 days of receipt of an invoice for the examination, together with the shortfall in royalties plus interest calculated at twelve percent (12%) per annum on such shortfall for the period from the date of when such royalties should have been paid to the date of actual payment. Any late payments of royalties shall be subject to interest calculated at twelve percent (12%) per annum for the period from the date of when such royalties should have been paid to the date of actual payment. Should Licensee refuse to pay royalties, or should Licensee make late payments of royalties for two out of any four consecutive calendar quarters, then LaserBand shall have the additional right to consider this Agreement to be incurably breached following LaserBand's written notice to Licensee of said breach and Licensee's failure to cure the breach within fifteen days.

4. Term. The term ("Term") of this agreement shall commence on August 10, 2000 and shall continue for the life of the last to expire of the Standard Patent and Riley Patents, subject to earlier termination as provided herein.

*   *   *   *

6. Trademark License. Ward Kraft shall use the LASER BAND trademark in connection with its sales and marketing of the Combo, under license from Laser Band. Laser Band hereby grants a royalty free license to use the LASER BAND trademark. Laser Band agrees that the forms manufactured as of the date of the term sheet agreement of August 10, 2000 by Ward Kraft meet the quality control standards of Laser Band under the mark. Notwithstanding the foregoing, should Ward Kraft wish to private brand any orders for Combo Forms, it shall first discuss same with Laser Band who shall grant such request so long as such private branding shall aid marketing of the Combo Form. All such private branding marks shall be communicated to Laser Band to facilitate enforcement of the Riley Patents and the Standard Patent.

7. Patent Marking. All Licensed Products sold by Licensee in the United States shall bear the marking "Licensed under one or more of U.S. Patent Nos. 5,653,472, and LaserBand U.S. Patents 5,933 ,993, 6,000,160, 6,067,739 and 6,438,881" and, if appropriate at that time, the added words "and others pending" or such other patent numbers as shall issue covering the Licensed Product.

8. Master Distribution of Wristband Only Forms. Licensor agrees to sell to Ward Kraft as a Master Distributor Wristband-Only forms at prices at least as favorable as those offered by Licensor to any other customer for similar quantities and under other similar te1ms. Wristband-Only forms shall be those forms which include one
or more wristbands (as defined in paragraph I above) without labels.

                \*      \*      \*      \*

b. This agreement supercedes any and all prior agreements with respect to the subject matter hereof, including without limitation as between Laser Band and Ward Kraft the Term Sheet Agreement of August 10, 2000, and this agreement represents the full and complete agreement of the parties with respect to the subject matter hereof, except that the covenant of Avery not to sue Licensee under the provisions of the Term Sheet of August 10, 2000 continues and survives.

c. This agreement shall inure to the benefit of the parties hereto, the successors and assigns, but may not be assigned by either party without the express written consent of the other, except to a successor of substantially all of the business of the party.

                \*      \*      \*      \*

e. Should any portion of this agreement be held invalid, illegal, or void, the remainder of the agreement shall continue in full force and effect as if the void, illegal or invalid provision had been deleted or never included provided that the agreement without such provision does not fail as to its essential purposes.

f. The following paragraphs shall survive the expiration or earlier termination of this agreement: paragraphs 4 and 9- 12.

       \*    \*    \*    \*

h. Licensor warrants that Avery has executed in the Term Sheet of August 10, 2000 a covenant not to sue Licensee with respect to Licensee's manufacture and sale of Licensed Products hereunder and
warrants that it holds a license with right to sublicense under the Standard Patent and is the owner of the Riley Patents. Ward Kraft hereby grants to each of Laser Band and Avery, and Laser Band hereby grants to Ward Kraft, a covenant not to sue under any intellectual property or other right in connection with the making, using, offering for sale, sale and importing of the Combo form. Notwithstanding the foregoing, Laser Band shall have the right to enforce any rights including without limitation its intellectual property rights against Ward Kraft upon breach of this license. This covenant not to sue does not extend to the making, using, offering for sale, sale, and importation of Wristband-Only forms, and no rights or duties are granted herein including without limitation any obligation to pay royalties, either express or implied, relating to Wristband-Only forms. Other than as provided herein regarding Avery and Standard Register, Licensor makes no representation or warranty that the Licensed Products may be manufactured, sold or used, free of infringement of patent 1ights or _other proprietary rights of others, it being
understood that except as regards the express representations made hereunder, Licensor shall not be liable for any loss, damage or expense arising from any claims of patent or other proprietary right infringement. Avery shall be a third party beneficiary of this Agreement with respect to the provisions of this paragraph.

1. IN NO EVENT SHALL LASER BAND OR STANDARD BE LIABLE TO WARD KRAFT OR ANY CUSTOMER OF WARD KRAFT FOR ANY COSTS, EXPENSES, DAMAGES, INCLUDING WITHOUT LIMITATION, DIRECT, INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, PUNITIVE,
LOST PROFITS OR SIMILAR DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, AND NEITHER LASER BAND NOR STANDARD MAKES AN IMPLIED WARRANTY OF ANY KIND UNDER THIS AGREEMENT, INCLUDING WITHOUT LIMITATION THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

The parties have set out the purpose of the License Agreement in the initial provisions:

> WHEREAS, Licensor is the owner by assignment of U.S. Patent Nos. 5,933,993, 6,000,160, 6,067,739 and 6,438,881 and patents which may issue from any applications claiming priority from the applications for those patents, including all continuations, continuations in part and divisionals thereof, and any re-issues, re-examinations and any extensions thereof (hereinafter the "Riley Patents"); and
>
> WHEREAS, Licensor is the holder of an exclusive license with the right to sublicense others under U.S. Patent No. 5,653,472 from The Standard Register Co. (hereinafter the "Standard Patent"); and
>
> WHEREAS, Licensor and Licensee have entered into a Settlement Agreement with The Standard Register Company ("Standard") dated August 11, 2000 and a Term Sheet Agreement with Avery Dennison Corporation ("Avery"), James Riley ("Riley") and Riley Barnard & O'Connell ("RBO") dated August 10, 2000 setting forth the terms for licensing the aforementioned Riley Patents and Standard Register Patent to Licensee in connection with the resolution of litigation between Standard, RBO and Ward/Kraft.

In entering into the License Agreement, Laser Band and Ward-Kraft seek to detail the licensing of the subject patents. Reading the License Agreement as a whole, the specific intent of the parties regarding the extent of the License Agreement is unascertainable. For example, throughout the License Agreement, the parties use the terms "licensed products" and "combo forms" in what appears to be random references.  At certain times, "licensed products" is used; at others, "combo form" is used, with no clear indication as to the reasons why the terms are used in the particular section.  In paragraph h, the term "*the* combo form" is used,

[17]

indicating a specific combo form, without reference to what combo form is indicated.

Moreover, although the parties state that the agreement continues beyond the expiration of the patents, there is nothing in the License Agreement which specifies whether this continuation applies to any and all subsequent products, or whether the covenant not to sue only applies to products in existence at the time, which would appear to be the intent considering the whole License Agreement and the stated purposes.

Construing the License Agreement as a whole and in the light most favorable to Defendants, the License Agreement fails unambiguously to define the terms upon which Plaintiff relies for its Motion. Summary judgment is therefore not appropriate.

## Conclusion

Based upon the foregoing analysis, Plaintiff is not entitled to judgment as a matter of law on Counts I and II.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Partial Summary Judgment, [Doc. No. 61], is denied.

Dated this 29th day of July, 2020.

                                        _____
                                        HENRY EDWARD AUTREY
                                      UNITED STATES DISTRICT JUDGE