UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| WARD-KRAFT, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:18CV1725 HEA |
| | ) |
| ZEBRA TECHNOLOGIES CORPORATION, | ) |
| et al., | ) |
| | ) |
| Defendants. | ) |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Plaintiff's Motions to Compel, [Doc. No.'s 84 and 86].  Defendants oppose the Motions.  For the reasons set forth below, the Motions are granted.

### Facts and Background

Plaintiff's First Amended Complaint alleges the following:

Since 1972, Ward Kraft has been a nationally known leader in the printing industry, specializing in the design and production of labels, commercial printing, mailers, and business forms. Ward Kraft's expertise includes creating continuous, unit set, cut sheet labels and form/label combinations for use in a variety of different industries.

In the late 1990's, Jim Riley approached Ward Kraft about assisting with the

design and development of self-laminating patient identification wristband forms for use in hospitals and throughout the medical industry. Jim Riley was then an officer of Riley, Barnard & O'Connell Business Products Inc. ("RBO"), and the owner of Laser Band, LLC.

Ward Kraft agreed and expended substantial time and resources, and provided valuable expertise, in order to develop these wristband forms, which the parties referred to as the "LB1" products. RBO agreed that, in return for Ward Kraft's significant contributions, Ward Kraft would have the exclusive right to manufacture the LB1 products. And Ward Kraft ultimately did, in fact, design and manufacture these products for RBO.

In March 1999, The Standard Register Company, another market participant, threatened RBO with litigation in relation to the LB1 products. RBO then brought suit against Standard Register, seeking a declaration of non-infringement, invalidity, and unenforceability of a patent owned by Standard Register relating to certain wristband forms and labels. Standard Register then filed counterclaims against RBO and Ward Kraft alleging patent infringement, which RBO and Ward Kraft denied.

In August 2000, RBO, Standard Register, and Ward Kraft came to an agreement to end all litigation and, in conjunction with additional interested non-parties Jim Riley, Laser Band, and the Avery Dennison Corporation, entered into

2

certain other agreements to govern the rights of the various entities moving forward.

As a result, in addition to a Settlement Agreement between RBO, Standard Register, and Ward Kraft, Laser Band and Ward Kraft entered into a separate License Agreement signed May 16, 2003 and made effective August 11, 2000, whereby Ward Kraft agreed to make and sell certain licensed wristband forms in exchange for the payment of royalties to Laser Band.

Under ¶ 1 of the License Agreement, and as reflected in various other portions of the License Agreement, Laser Band granted to Ward Kraft a royalty-bearing, non-exclusive license/sub-license under four patents owned by Laser Band (referred to as the "Riley Patents" in the License Agreement) and one patent owned by Standard Register and licensed to Laser Band (referred to as the "Standard Patent" in the License Agreement). The license granted Ward Kraft the right, under the aforementioned patents, to make, use, offer to sell, sell, and import certain types of forms identified by Laser Band as PLS-102 and PLS-102W, as well as "other forms having both labels and a Wristband, the wristband being formed from a portion of the face ply and a portion of the liner ply, with the liner ply having a pair of integrally formed tabs for fastening the wristband and with a substantial portion of the face ply in the completed wristband being laminated on

both sides by the portion of the liner ply." These forms are defined and referred to throughout the License Agreement as "Combo Forms."

Paragraph 1 of the License Agreement further states that "Combo Forms covered by any of the Riley Patents or the Standard Patent shall be considered as 'Licensed Products'."

In addition to the royalty-bearing patent license granted by Laser Band to Ward Kraft, the License Agreement includes a mutual covenant by the parties not to sue each other in connection with Combo Forms. Specifically, in ¶ 12(h) of the License Agreement, Laser Band granted to Ward Kraft and Ward Kraft granted to Laser Band "a covenant not to sue under *any intellectual property or other right* in connection with the making, using, offering for sale, sale and importing of the Combo form." (Emphasis added). This mutual covenant not to sue is not limited to the Riley Patents or Standard Patent—or even patent rights generally—and is on its face broader in scope than the license granted by Laser Band to Ward Kraft under ¶ 1 of the License Agreement (regarding "Licensed Products").

By entering into a covenant not to sue with Ward Kraft, Laser band created a nonexclusive license whereby Laser Band no longer had the right to sue Ward Kraft regarding the Combo form pursuant to any legal theory (whether related to intellectual property or otherwise). Laser Band's property interest in its intellectual

4

property no longer included the right to sue Ward Kraft for infringement of either its patents or trademarks (including trade dress) regarding the Combo form.

Ward Kraft complied with all of its duties and obligations under the License Agreement. At no point has there been any evidence or accusation by Laser Band or any successor company that Ward Kraft breached or failed to fulfill its duties or obligations under the License Agreement. In fact, Ward Kraft manufactured the License Products and paid Laser Band millions of dollars in royalties based upon its sale of Licensed Products throughout the life of the License Agreement.

Paragraph 12(f) of the License Agreement states that ¶¶ 4 and 9-12 will survive the expiration or earlier termination of the License Agreement. Under ¶ 12(c), the License Agreement inures to the benefit of the parties (Laser Band and Ward Kraft), as well as their "successors and assigns."

By operation of law, the covenant not to sue in the License Agreement extends to Ward Kraft's customers and distributors, including but not limited to Typenex.

On March 20, 2014, Laser Band assigned its "rights, title, and interest" in sixteen different trademarks to ZIH Corp., including trademarks used on or in connection with Combo Forms. At the time of the assignment, Laser Band's rights and interest in the trademarks did not include a right to sue Ward Kraft for infringement of the trademarks (or of any other intellectual property or other right)

in connection with the making, using, offering for sale, sale, or importation of Combo Forms.

Laser Band had waived its rights to sue Ward Kraft for infringement on its intellectual property by entering into the License Agreement containing the covenant not to sue.

ZIH Corp. only acquired the rights, interest, and title Laser Band possessed when the sixteen trademarks were assigned to ZIH Corp from Laser Band, which (due to the covenant not to sue) did not include the right to sue Ward Kraft regarding the Combo form. The covenant not to sue in the License Agreement runs with the trademarks assigned by Laser Band. ZIH Corp., Zebra Technologies Corporation, Zebra Technologies International, LLC, and / or any other entity claiming ownership of trademarks assigned by Laser Band have no legal right to make any claims against Ward Kraft regarding the Combo form due to the covenant not to sue in the License Agreement.

In 2012, upon information and belief, Defendants Zebra Technologies Corporation, Zebra Technologies International, LLC, and/or ZIH Corp. acquired all or substantially all of Defendant Laser Band and its business. Upon information and belief, all of these entities are now affiliated.

In seeking a federal trademark registration for certain purported trade dress, and more particularly in seeking to benefit from Laser Band's prior use of the

purported trade dress, ZIH Corp. filed a "Request for Reconsideration in Response to Final Office Action of May 30, 2018" (the "Response") with the U.S. Trademark Office.  In the Response at page 3, ZIH refers to Laser Band LLC as its "predecessor company," states that ZIH (the applicant) "acquired Laser Band in 2012," and refers to Laser Band as one of "its divisions." In the Response at page 2, ZIH states that Zebra Technologies International spends money to market Zebra Technologies International's Laser Band products, that Zebra Technologies International has revenue figures for Laser Band products, and that Zebra Technologies International sells Zebra Technologies International's Laser Band products. The Response includes a sworn declaration of Mike Thieme. Mike Thieme is the former Vice President of Global Operations at Laser Band LLC and the current Director of Operations at Zebra Technologies International. In the Thieme Declaration at ¶ 1, Mike Thieme states that Laser Band LLC is "a wholly owned subsidiary of Zebra Technologies Corporation." In the Thieme Declaration at ¶¶ 1-2, Mike Thieme defines Zebra Technologies International as "Zebra" and states that he is "personally knowledgeable about how Zebra markets its Laser Band products, how much Zebra spends to market its Laser Band products, Zebra's revenue figures for Laser Band products, and how and to whom Zebra sells its Laser Band products." In the Thieme Declaration at ¶¶ 1, 5, Mike Thieme states that Laser Band is Zebra Technologies International's "predecessor

company."  In the Thieme Declaration at ¶¶ 1, 12, Mike Thieme states that Laser Band is Zebra Technologies International's "predecessor-in-interest." In the Thieme Declaration at ¶¶ 1, 9, Mike Thieme states that Zebra Technologies International, "by and through Laser Band, has sold such forms using the color blue since as early as September 27, 2002." And, "[s]ince at least 2002, I believe that [Zebra Technologies International's] use of the color blue has been substantially exclusive for patient-identification wristband forms for the healthcare industry." In the Thieme Declaration at ¶¶ 1, 9, Mike Thieme states that "[Zebra Technologies International's] revenue figures for its Laser Band products total more than $100 million from 2014 to 2017."

On January 22, 2019, a document was recorded with the Assignment Services Branch of the U.S. Trademark Office purporting to show that ZIH Corp. merged with and into Zebra Technologies Corporation. This document was recorded at Reel/Frame 6532/0006.

On July 9, 2018, Defendant Laser Band along with its corporate successors Defendants Zebra Technologies Corporation, Zebra Technologies International, LLC, and/or ZIH Corp (collectively, "Zebra") filed a lawsuit in the District Court for the Northern District of Illinois (Case No. 1:18-cv-04711-SLE) (the "NDIL Lawsuit") against Ward Kraft and one of its primary distributors, Typenex Medical, LLC ("Typenex").

The Complaint in the NDIL Lawsuit refers to "Plaintiffs Zebra Technologies Corporation ("ZTC") and its wholly owned subsidiaries Zebra Technologies International, LLC ("ZTI"), Laser Band LLC ("Laser Band"), and ZIH Corp. ("ZIH") (collectively "Plaintiffs" or "Zebra")." According to the Complaint in the NDIL Lawsuit, which was filed in 2018, "Zebra" has "continuous use" of various Laser Band trademarks "over the last [12 or 16] years."

The NDIL Complaint further states that "Zebra acquired Laser Band in 2012, including Laser Band's trademarks and trade dress rights, and the goodwill associated with such marks and trade dress."

While the trademark-based claims in the NDIL Lawsuit are ostensibly brought in the name of one or more Zebra entities, in every such Count they allege that Ward Kraft's and/or Typenex's acts irreparably damage "Plaintiffs," or that "Plaintiffs" have suffered commercial damage—never is the harm limited to a single entity, or even simply the Zebra entities. Thus, "Zebra"—including Zebra Technologies Corporation; Zebra Technologies International, LLC; Laser Band LLC; and ZIH Corp.—has enjoyed for itself, as a collective, all of the benefits of Laser Band's trademark and trade dress rights (to the extent they exist), including for purposes of pleading claims in the NDIL Lawsuit.

The NDIL Lawsuit alleges that Ward Kraft is manufacturing, using, and/or selling a number of various forms that infringe Laser Band's and/or Zebra's

intellectual property rights. Specifically, Laser Band and Zebra allege that "Ward Kraft manufactures and sells business forms that incorporate self-laminating, laser-printable patient identification wristbands, which Typenex markets and sells under the following marks: Helix AC Laser (Adult), Helix AC Laser L2 (Adult), Helix AC Laser L2 (Pediatric/Infant), Helix AC Laser L3 (Adult), FamBand Helix Laser AC, and FamBand Laser," which the Complaint in the NDIL Lawsuit refers to as "Typenex Products."

Laser Band and Zebra also allege that "Ward Kraft markets and sells business forms that incorporate self-laminating, laser-printable patient identification wristbands under the PolyBand mark."  All of these accused products are the successor wristband forms to the original LB1 products mentioned above. More specifically, the NDIL Lawsuit alleges that the Helix AC Laser L2 and/or Helix AC Laser L3 products infringe one or more of Laser Band's U.S. Patent No. 7,779,569, U.S. Patent No.8,011,125, U.S. Patent No. 7,017,293, U.S. Patent No. 7,017,294, U.S. Patent No. 7,222,448, U.S. Patent No. 7,325,347, U.S. Patent No. 7,461,473, and U.S. Patent No. 7,779,570.

The NDIL Lawsuit alleges that the Helix AC Laser (Adult), Helix AC Laser L2 (Adult), Helix AC Laser L2 (Pediatric/Infant), Helix AC Laser L3 (Adult), FamBand Helix Laser AC, FamBand Laser, and PolyBand 3 products infringe one or more of Laser Band's and/or Zebra's trademark or trade dress rights under 15

U.S.C. § 1125(a). The NDIL Lawsuit also alleges that Ward Kraft uses Laser Band's and/or Zebra's LASER BAND trademark in a misleading fashion such that Ward Kraft violates 15 U.S.C. § 1125(a).

All of the products named in the NDIL Lawsuit fall within the definition of a Combo Form as defined in ¶ 1 of the License Agreement between Laser Band and Ward Kraft. Moreover, all twelve Counts asserted by Laser Band and the Zebra entities in the NDIL Lawsuit are based upon an intellectual property (or other) right. Thus, all of the Counts asserted by Laser Band and Zebra in the NDIL Lawsuit fall within the covenant not to sue that Laser Band granted to Ward Kraft in the License Agreement.

Laser Band and the remaining Zebra Entities, as successors, assigns, and/or predecessors of Laser Band, breached the covenant not to sue in ¶ 12(h) of the License Agreement by filing the NDIL Lawsuit against Ward Kraft and alleging violations of intellectual property (or other) rights through the sale of wristband form products that qualify as Combo Forms under the License Agreement.

Under ¶ 12(a) of the License Agreement, Laser Band and Ward Kraft agreed to litigate any action to enforce the License Agreement exclusively before the federal courts in the Eastern District of Missouri. Indeed, this paragraph states that the License Agreement shall be construed, interpreted, and applied pursuant to the laws of the State of Missouri, and contains the following provision:

[A]ny action by any party to enforce any provision of this Agreement shall be brought exclusively in the United States District Court for the Eastern District of Missouri, Eastern Division.

In the NDIL Lawsuit, Ward Kraft has pleaded the covenant not to sue as an affirmative defense to Laser Band's and Zebra's claims but has not asserted any affirmative cause of action for breach or to enforce the License Agreement.

Roughly one week before the License Agreement was signed, Ward Kraft and Laser Band entered into a LaserBand Authorized Master Distributor Agreement ("Master Distributor Agreement"). According to the Master Distributor Agreement, "[Ward Kraft] is hereby granted a limited license to use [Laser Band's] trademarks including its registered trademark "LASERBAND" and any other trademarks or service marks (each, a "Licensed Trademark")…"

According to the Master Distributor Agreement, Laser Band and Ward Kraft "agree to indemnify and hold each other harmless from and against all claims, liabilities, losses, damages or expenses, including reasonable attorney fees, by reason of any claim arising out of the other's actions or omissions…" "The scope of this includes and is not limited to misrepresentations…, actions or promises made by [Laser Band] or [Ward Kraft], its employees and/or agents to the other or customers, end-user prospects." According to the Master Distributor Agreement, "Each party shall be entitled to recover all reasonable costs, expenses and attorneys' fees incurred by such party directly or indirectly related to any breach of

any term or condition of this Agreement, or any agreement or other document entered into in connection therewith.

On March 18, 2019, Ward Kraft received a letter dated March 14, 2019 from Mike Thieme on letterhead for "Laser Band, LLC[,] A Zebra Technologies Company" (the "Termination Letter").  In the Termination Letter, Defendants state that "Ward Kraft's appointment as an Authorized LaserBand Master Distributor [under the LaserBand Authorized Master Distributor Agreement, dated May 8, 2003] is hereby terminated, effective sixty (60) days from the date of your receipt of this notice," effectively acknowledging that the Master Distributor Agreement was in force as of the date of the Termination Letter.

Upon information and belief, while the Master Distributor Agreement was in force, Defendants misrepresented to customers and end-user prospects Ward Kraft's right to sell various products and use various trademarks, and sued Typenex and Ward Kraft in the NDIL Lawsuit as discussed above. Ward Kraft has suffered significant damages as a result of Defendants' conduct.

Plaintiff moves to compel discovery.  Plaintiff claims Defendants have failed to respond to interrogatories and requests for documents in any meaningful way. Defendants argue the motions are premature, that they have or will provide the requested discovery, and that they stand on their substantive objections.

**Discussion**

## Standards Governing Discovery

Federal Rule of Civil Procedure 26(b)(1) sets forth the scope of discovery in

civil cases pending in federal court:

> Unless otherwise limited by court order, the scope of discovery is as follows:
> Parties may obtain discovery regarding any nonprivileged matter that is
> relevant to any party's claim or defense and proportional to the needs of the
> case, considering the importance of the issues at stake in the action, the
> amount in controversy, the parties' relative access to relevant information,
> the parties' resources, the importance of the discovery in resolving the
> issues, and whether the burden or expense of the proposed discovery
> outweighs its likely benefit. Information within the scope of discovery need
> not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). Rule 26 contains specific limitations relative to

objections to providing discovery:

> (C) *When Required*. On motion or on its own, the court must limit the
> frequency or extent of discovery otherwise allowed by these rules or by local
> rule if it determines that:
>     (i) the discovery sought is unreasonably cumulative or duplicative, or
> can be obtained from some other source that is more convenient, less
> burdensome, or less expensive;
>     (ii) the party seeking discovery has had ample opportunity to obtain
> the information by discovery in the action; or
>     (iii) the proposed discovery is outside the scope permitted by Rule
> 26(b)(1).

Fed. R. Civ. P. 26(b)(2)(C).

If a party fails to respond to a proper request for discovery, or if an evasive

or incomplete response is made, the party requesting the discovery is entitled to

move for a motion compelling disclosure after having made a good faith effort to

resolve the dispute by conferring first with the other party. See Fed. R. Civ. P. 37(a).

The scope of discovery under Rule 26(b) is extremely broad. See 8 Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2007 (3d ed. Oct. 2020 update). The reason for the broad scope of discovery is that "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession." *Id.* (quoting *Hickman v. Taylor*, 329 U.S. 495, 507-08 (1947)). The Federal Rules distinguish between discoverability and admissibility of evidence. Fed. R. Civ. P. 26(b)(1), 32, and 33(a)(2) & (c). Therefore, the rules of evidence assume the task of keeping out incompetent, unreliable, or prejudicial evidence at trial. But these considerations are not inherent barriers to discovery.

"Relevancy is to be broadly construed for discovery issues and is not limited to the precise issues set out in the pleadings. Relevancy ... encompass[es] 'any matter that could bear on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.' " *E.E.O.C. v. Woodmen of the World Life Ins. Soc'y*, No. 8:03CV165, 2007 WL 1217919, at *1 (D. Neb. Mar. 15, 2007) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)).

The party seeking discovery must make a "threshold showing of relevance before production of information, which does not reasonably bear on the issues in

the case, is required." *Woodmen of the World*, 2007 WL 1217919, at *1 (citing

*Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1993)). "Mere speculation

that information might be useful will not suffice; litigants seeking to compel

discovery must describe[,] with a reasonable degree of specificity, the information

they hope to obtain and its importance to their case." *Woodmen of the World*, 2007

WL 1217919, at *1 (citing *Cervantes v. Time, Inc.*, 464 F.2d 986, 994 (8th Cir.

1972)).

      Discoverable information itself need not be admissible at trial; rather, the

defining question is whether it is within the scope of discovery. See Fed. R. Civ. P.

26(b)(1). Additionally, the court may limit the frequency and extent of discovery.

See Fed. R. Civ. P. 26(b)(2); see also *Roberts v. Shawnee Mission Ford, Inc.*, 352

F.3d 358, 361 (8th Cir. 2003) ("The rule vests the district court with discretion to

limit discovery if it determines, inter alia, the burden or expense of the proposed

discovery outweighs its likely benefit."); *Cont'l Ill. Nat'l Bank & Trust Co. of Chi.*

*v. Caton*, 136 F.R.D. 682, 684-85 (D. Kan. 1991) ("All discovery requests are a

burden on the party who must respond thereto. Unless the task of producing or

answering is unusual, undue, or extraordinary, the general rule requires the entity

answering or producing the documents to bear that burden.").

      The Court has reviewed the interrogatories, requests for production of

documents, and Defendants' objections.  Plaintiff has articulated the reasons for

seeking the information.  Defendants' objections are overruled. To the extent there is still outstanding discovery that has not been sent to Plaintiff, Defendants shall comply with Plaintiff's requests.

### Conclusion

Plaintiff has specified the reasons for seeking the answers to interrogatories and requests for production.  Defendants are required under the Federal Rules to comply with the requests and have advised the Court that they have or will comply with certain items.  Defendants' objections to the remaining items are overruled.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motions to Compel, [Doc. No.'s 84 and 86] are granted.

**IT IS FURTHER ORDERED** that Defendants shall comply with the discovery requests within 14 days from the date of this Opinion, Memorandum and Order.

**IT IS FURTHER ORDERED** that Plaintiff's request for attorney's fees is denied.

Dated this 25th day of January, 2021.


_____

HENRY EDWARD AUTREY

UNITED STATES DISTRICT JUDGE